**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTONIO J. TURNER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-1104** |
| | ) | |
| **JOSEPH NISH,[1] Superintendent,** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **SCI-Waymart, the DISTRICT** | ) | |
| **ATTORNEY OF ALLEGHENY** | ) | |
| **COUNTY, and the ATTORNEY** | ) | |
| **GENERAL OF PENNSYLVANIA,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Petitioner Antonio J. Turner ("Turner"), a prisoner incarcerated at the State Correctional Institution in Waymart, Pennsylvania ("SCI-Waymart"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Commonwealth of Pennsylvania contends that the petition should be denied, and that no certificate of appealability ("COA") should be issued.  For the reasons that follow, the petition will be denied, and no COA will be issued.

I.      **Background and Procedural History**

At approximately 1:00 P.M. on May 4, 1990, members of the North Braddock Fire Department responded to reports of a blaze at 913 Benton Street, in North Braddock,

---

[1]The proper respondent in a habeas corpus action is the person with immediate physical custody of the petitioner.  *Rumsfeld v. Padilla*, 542 U.S. 426, 434-435 (2004).  When the petitioner, Antonio J. Turner ("Turner"), filed the instant petition, he was housed at the State Correctional Institution in Graterford, Pennsylvania ("SCI-Graterford").  Doc. No. 1, p. 1.  For this reason, David Diguglielmo, the Superintendent at SCI-Graterford, was named as a respondent.  At the present time, however, Turner is housed at the State Correctional Institution in Waymart, Pennsylvania ("SCI-Waymart").  Doc. No. 26.  For this reason, Joseph Nish ("Nish"), the Superintendent at SCI-Waymart, has been substituted as a respondent.  FED. R. CIV. P. 25(d).

Pennsylvania.  Second Trial Transcript ("STT") at 50.  Upon their arrival, they discovered that the fire had originated at the bottom of a flight of stairs leading from the first floor to the basement of the residence.  STT at 52.  At the bottom of the stairs was the charred body of 19-year-old Cordel Franklin ("Franklin").  STT at 54.  Franklin, a resident of the household, had been beaten with a baseball bat, repeatedly stabbed, and set afire.

Turner and Franklin had apparently been "best friends."  STT at 328.  They had been together on May 4, 1990.  On that day, members of the North Braddock Police Department spoke with Nikela Carrington ("Carrington"), a black female who was Turner's girlfriend.  Carrington indicated that she had no information concerning how Franklin had been killed.  STT at 329.  She gave a similar statement to police officers on July 25, 1990.  *Id.*  Nevertheless, on August 9, 1990, Carrington told police officers that Turner had committed the murder in her presence.  *Id.*  That same day, homicide detectives and police officers executed a warrant to retrieve the articles of clothing that Turner had worn on May 4, 1990.  STT at 201.  Turner was ultimately charged with one count of criminal homicide, one count of arson, one count of risking a catastrophe, and two counts of recklessly endangering another person.

Turner was tried for the murder of Franklin in the Court of Common Pleas of Allegheny County, Pennsylvania (the "trial court"), before Judge Robert E. Dauer ("Judge Dauer").  The trial commenced on February 4, 1992.  Testimony was taken from Theresa Delaney ("Delaney"), who had been Franklin's girlfriend for approximately two to three weeks prior the murder.  First Trial Transcript ("FTT") at 292.  Delaney's residence had been in close proximity to that of Franklin.  FTT at 293.  Delaney testified that, on the night of May 3, 1990, Franklin had slept at her house.  FTT at 294.  According to Delaney, Franklin had instructed her to wake him up in the

morning if "Two-Tone" were to come around.  FTT at 295.  "Two-Tone" was apparently

Turner's nickname.  *Id.*  The next morning, Delaney saw Turner standing across the street with a

black female.  FTT at 296.  Upon seeing Turner, Delaney woke Franklin up and told him that

Turner was outside.  FTT at 298.  Franklin proceeded to leave Delaney's residence.  *Id.*  Delaney

watched as Franklin, Turner and the black female walked away.  FTT at 300-301.  Delaney

learned of Franklin's death when speaking with Carrington later that day.  FTT at 301-302.

Delaney, a friend of Carrington, testified at trial that the black female with Turner on the

morning of May 4, 1990, had been someone other than Carrington.  FTT at 301-303.

Testimony was also taken from Carrington.  Carrington, the mother of Turner's child,

gave a grisly account of the murder.  According to Carrington, Turner telephoned her at

approximately 8:00 A.M. on the morning of May 4, 1990, and told her to meet him in the "Super

Duper" parking lot.  FTT at 312.  When she arrived, Turner told her that he intended to kill

Franklin because Franklin had tried to have somebody kill him.[2]  FTT at 313.  Turner and

Carrington walked into Braddock General Hospital (the "hospital"), where Turner grabbed a pair

of rubber surgical gloves.  FTT at 313-317.  The two of them left the hospital and went in

separate directions.  FTT at 317.

According to Carrington's testimony, Turner telephoned Carrington again at

approximately 10:00 A.M. on the morning of May 4, 1990, and told her to meet him on a nearby

street corner.  FTT at 318.  The corner was two houses away from Delaney's residence.  FTT at

319.  Carrington met Turner at the corner, where the two of them proceeded to hug and kiss each

---

[2]At Turner's second trial, Carrington provided more details about Franklin's alleged attempt to have Turner killed.  According to Carrington, Turner had accused Franklin of trying to get an individual named "Tungee" to shoot him.  STT at 336.

other.  FTT at 320.  While Turner and Carrington were embracing, Franklin exited Delaney's residence.  FTT at 320.  Turner asked Franklin if the three of them could go to Franklin's residence to talk, and Franklin responded in the affirmative.  FTT at 321.  They walked through Delaney's back yard and proceeded to Franklin's residence.  *Id.*

Once the three individuals were inside of Franklin's residence, Turner went into the bathroom.  FTT at 325.  Franklin told Carrington that he wanted her to listen to a tape that he had made.  FTT at 326.  According to Carrington's testimony, Turner attacked Franklin with a baseball bat as Franklin was preparing to play the tape.  FTT at 326-331.  Turner struck Franklin in the head with the bat six times.  FTT at 332.  As he hit Franklin, Turner repeatedly exclaimed, "You set me up!"  FTT at 334.  Carrington urged Turner to stop the attack, but Turner told her to "be quiet."  FTT at 335.  Turner reached into his jacket pocket and pulled out a knife.  *Id.*  He stabbed Franklin twice, causing the knife to bend.  *Id.*  At that point, Turner went into the kitchen, grabbed a different knife, and stabbed Frankin two more times.  FTT at 338-340. Turner then proceeded to drag Franklin down a flight of stairs leading to the basement of the residence.  FTT at 340.  Carrington screamed, but Turner told her that the "same thing" would happen to her if she did not "be quiet."  FTT at 341.  When Carrington told Turner that a mailman was outside of the residence, Turner instructed her to close the front door, which had apparently been open throughout the attack.  FTT at 342.  Carrington complied with this request. *Id.*  While the attack was underway, Turner was wearing the rubber surgical gloves that he had taken from the hospital earlier that morning.  FTT at 343.

Carrington also described how Turner attempted to disguise the murder.  According to Carrington, Turner instructed her to give him some newspapers.  FTT at 361.  She gave him

some newspapers, and he began to take them down to the basement and place them on top of Franklin.  FTT at 362.  After covering Franklin with newspapers, Turner came to the top of the stairs and started to squirt charcoal lighter fluid into the basement.  FTT at 363.  Turner pulled out some matches, lit a piece of paper on fire, and placed it on top of Franklin.  FTT at 364. After setting Franklin on fire, Turner came upstairs and turned on the "gas jets" of Franklin's stove.  FTT at 368-369.  Turner and Carrington exited Franklin's residence.  FTT at 370.  When Carrington told Turner that he would end up going to jail for his actions, he stated that he had done his "shit smoothly."  FTT at 371.  Specifically, he told her that the "gas jets" would cause the residence to explode, thereby making Franklin's death look like an accident.  *Id.*

Carrington spoke with law enforcement authorities later than day, but she did not implicate Turner in the murder.  She testified that she had been scared to explain what Turner had done.  FTT at 372.  One day later, on May 5, 1990, Turner "broke up" with Carrington.  FTT at 373.  He told her that he did not want to "be with" somebody who he had to hurt, and that he would have to hurt her if she were to "open [her] mouth."  *Id.*

On cross-examination, Carrington was asked why Turner had killed Franklin.  FTT at 377.  She reiterated that Turner had complained about being "set up" by Franklin.  *Id.*  In addition, Carrington admitted that she had engaged in sexual intercourse with Franklin on one occasion.  FTT at 377, 443.  She testified that Turner had mentioned this sexual encounter as a justification for killing Franklin.  *Id.*  When asked why she had given false statements to law enforcement authorities on May 4, 1990, and July 25, 1990, Carrington stated that she had been afraid that Turner would retaliate against her if she were to tell the truth about the murder.  FTT at 406-411.

5

Carolyn Morrison ("Morrison") and Roiann Johnson ("Johnson") testified on behalf of Turner.  Morrison testified that, during a heated argument sometime after the murder, Carrington had threatened to kill her (i.e., Morrison) in the same way that *she* (i.e., Carrington) had killed Franklin.  FTT at 483.  Johnson testified that, after hearing a rumor that Carrington was responsible for Franklin's death, she had called Carrington a "killer" during a telephone conversation.  FTT at 490-491.  According to Johnson, Carrington responded by saying, "Yeah, I killed Corey, just like I'll kill you.  You killed your mother.  Go dig her up, bitch."  FTT at 491.  Both Morrison and Johnson testified that they had reported Carrington's statements to law enforcement authorities.  FTT at 483, 496.

Turner opted not to testify.  In his closing argument to the jury, Turner's counsel, Patrick Thomassey ("Thomassey"), pointed out that, according to Delaney, the black female with Turner on the morning of the murder had been someone other than Carrington.  FTT at 513-514.  This was an apparent attempt to discredit Carrington's testimony.  Carrington, of course, had testified that *she* had been with Turner as Franklin was leaving Delaney's residence.  FTT at 320. Confronted with the conflicting evidence, the jury was unable to reach a verdict.  The trial court declared a mistrial on February 18, 1992.  FTT at 624-626.

On June 24, 1992, Turner, through Thomassey, filed a motion seeking an order to compel Carrington to undergo a psychological examination.  Doc. No. 20-5, pp. 25-28.  The alleged purpose of the examination was to enable the trial court to assess Carrington's competence to testify at Turner's impending retrial.  Doc. No. 20-5, p. 25, ¶ 6.  The motion was apparently never addressed by the trial court.

Turner was retried in the trial court before Judge Jeffrey Manning ("Judge Manning" or

the "trial judge").  The trial commenced on May 5, 1993, and concluded on May 10, 1993.  The

testimony given by Delaney, Carrington, Morrison and Johnson during the retrial was essentially

the same as that which had been given by them during the first trial.  Delaney testified that the

black female with Turner on the morning of the murder had been someone other than Carrington.

STT at 279-280.  Carrington again provided a graphic description of Turner's attack on Franklin.

STT at 286-401.  Morrison and Johnson both testified that Carrington had verbally claimed

responsibility for killing Franklin.  STT at 430-445.

At the second trial, the Commonwealth called a new witness to testify.  This witness was

Ronald Dwayne Bunkley ("Bunkley"), who had befriended Turner in prison.  Bunkley testified

that, when he had been nearing the end of his sentence, Turner had arranged for Carrington and

Bunkley to visit him at the same time.  STT at 405.  According to Bunkley, the purpose of this

visit was to enable him to identify Carrington, who Turner wanted him to kill.  *Id.*  Bunkley

explained that Turner had offered to pay him to kill Carrington so that she could not testify

during the retrial.  STT at 405-406, 416, 419.  He identified Carrington, who was sitting inside of

the courtroom, as the person who Turner had asked him to kill.  STT at 407.  He declared that he

had refused Turner's offer to kill Carrington after learning that Carrington had given birth to

Turner's child.  STT at 408-409.  Bunkley also testified that Turner had admitted to killing

Franklin with a baseball bat.  STT at 420.  He stated that he had agreed to testify in order to save

Carrington's life.  STT at 423.

Based on the evidence presented during the second trial, the jury convicted Turner of one

count of first-degree murder, one count of arson, one count of risking a catastrophe, and two

counts of recklessly endangering another person.  STT at 524.  After learning that the

Commonwealth would not be presenting additional evidence concerning the propriety of a

capital sentence, the trial judge determined that the Commonwealth could not establish the

existence of any statutory aggravating factors.  STT at 531-532.  Therefore, Turner was

immediately sentenced to a term of life imprisonment.[3]  STT at 535.

In a letter to the trial judge dated March 27, 1994, Carrington made the following

statements:

> Judge Manning, I know this is going to sound very difficult, but I need you to
> understand that the testimony I gave inside your court room about Antonio Turner
> I was forced to give.  I didn't know nor understand what was going on that day,
> why he did not take a pleas [sic] bargain because he is not guilty.  I'm sorry it had

---

[3]The only possible sentences in Pennsylvania for the crime of first-degree murder are death and life
imprisonment.  42 PA. CONS. STAT. § 9711(a)(1).  Pennsylvania's sentencing statute for the crime of first-degree
murder provides, in pertinent part, as follows:

**§ 9711.  Sentencing procedure for murder of the first degree**

\*\*\*

**(c) Instructions to jury.--**
(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the
following matters:

\*\*\*

(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating
circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously
finds one or more aggravating circumstances which outweigh any mitigating circumstances.  The
verdict must be a sentence of life imprisonment in all other cases.

\*\*\*

**(d) Aggravating circumstances.–**Aggravating circumstances shall be limited to the following:

\*\*\*

(6) The defendant committed a killing while in the perpetration of a felony.
(7) In the commission of the offense the defendant knowingly created a grave risk of death to
another person in addition to the victim of the offense.
(8) The offense was committed by means of torture.

42 PA. CONS. STAT. § 9711(c)(1)(iv), (d)(6)-(8).  At the close of the evidence in Turner's trial, the Commonwealth
withdrew the aggravating circumstance of "torture," since the evidence indicated that Franklin had already been
dead by the time that Turner had set his body on fire.  STT at 527-528, 532.  After learning that the Commonwealth
did not plan to introduce additional evidence at the sentencing stage, the trial judge ruled that the evidence presented
at trial was insufficient to establish the existence of the remaining two aggravating factors at issue.  STT at 532.
Specifically, the trial judge determined that the killing had not been committed during "the perpetration of a felony"
because the arson had occurred *after* the murder, and that the remaining aggravating factor could not be established
because nobody other than Franklin had been placed in "grave risk of death."  STT at 528, 532.

to come out so late, but I was scared and I'm still scared.

Doc. No. 20-3, p. 23.  On June 20, 1994, Thomassey filed a motion to withdraw as Turner's

counsel, contending that Carrington had contacted him to recant her trial testimony.  Doc. No.

20, p. 3.  A hearing was held on January 23, 1995.[4]  Turner, through counsel, made an oral

motion for a new trial based on Carrington's recantation.  Doc. No. 20-3, p. 21.  Carrington

testified that her trial testimony had been truthful, and that the statements in her letter of March

27, 1994, had been false.  Doc. No. 20-3, p. 23.  The trial court granted Thomassey's motion to

withdraw and appointed John Elash ("Elash") to represent Turner.  *Id.*

Another hearing was held on June 1, 1995.  Thomassey testified that he had spoken with

Carrington on February 24, 1994, and on March 3, 1994.  Evidentiary Hearing Transcript

("EHT") at 6.  He further testified that, on both occasions, Carrington had characterized her trial

testimony as untruthful.  EHT at 7.  The trial court denied Turner's motion for a new trial in an

order dated August 3, 1995.  Doc. No. 20-4, p. 25.  Turner filed a notice of appeal to the

Pennsylvania Superior Court on August 25, 1995.  Doc. No. 20, p. 3.

On September 20, 1995, the trial judge sentenced Turner to a term of not less than ten nor

more than twenty years of imprisonment for the crime of arson.  Sentencing Hearing Transcript

("SHT") at 6.  This sentence was to run concurrently with the life sentence that had already been

imposed for the crime of first-degree murder.  *Id.*  Turner appealed this sentence to the Superior

Court on October 19, 1995.  Doc. No. 20, p. 4.  His two appeals were subsequently consolidated.

*Id.*  On July 30, 1996, pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the trial

---

[4]The record does not include a transcript of this hearing.  The Court infers the content of the testimony given at the hearing from other portions of the record.

9

judge filed an opinion explaining his reasons for denying Turner's motion for a new trial.  Doc.

No. 1, pp. 19-22.  In a brief filed with the Superior Court on October 3, 1996, Turner argued that

a new trial was warranted because of Carrington's recantation, and that the trial court had erred

in finding to the contrary.  Doc. No. 20-3, pp. 1-19.  On February 4, 1997, the Superior Court

affirmed Turner's convictions and sentences.  Turner filed a petition for allowance of appeal on

March 4, 1997.  Doc. No. 20-4, pp. 1-16.  The petition was denied by the Pennsylvania Supreme

Court on September 9, 1997.  Doc. No. 20-5, p. 1.

On September 14, 1998, Turner filed a *pro se* petition for collateral relief pursuant to

Pennsylvania's Post Conviction Relief Act ("PCRA") [42 PA. CONS. STAT. § 9541 *et seq.*].

Robert Stewart ("Stewart") was appointed to represent Turner during the PCRA proceedings.

Doc. No. 20, p. 5.  After permitting Stewart to withdraw from the case, the trial court appointed

Thomas N. Farrell ("Farrell") to represent Turner.  *Id.*  An amended PCRA petition was filed on

November 6, 2003.  Doc. No. 20-5, pp. 2-20.  In the petition, Turner argued that Thomassey had

been ineffective for failing to request a "corrupted source" instruction concerning Carrington's

trial testimony and for failing to pursue his motion to compel Carrington to undergo a

psychological examination.  Doc. No. 20-5, pp. 8-18.  He contended that Elash had been

ineffective for failing to raise these ineffectiveness claims on direct appeal.  *Id.*  Turner also

requested scientific testing to discover the source of fingerprints that had been found inside of

Franklin's residence on the day of the murder.  Doc. No. 20-5, p. 19.

On July 10, 2005, the trial judge filed a memorandum opinion expressing his intention to

dismiss Turner's PCRA petition.  Doc. No. 20-5, pp. 32-35.  The petition was ultimately

dismissed in an order dated November 28, 2005.  Doc. No. 20-5, p. 36.  Turner appealed the

10

denial of his PCRA petition to the Superior Court on December 5, 2005.  Doc. No. 20, p. 6.  In

his brief to the Superior Court, Turner addressed all of the issues which had been raised in his

amended PCRA petition.  Doc. No. 20-6, pp. 9-28.  The Superior Court rejected Turner's

arguments on December 5, 2006, holding that the trial court had properly denied the petition.

Doc. No. 20-6, pp. 36-41.  On January 4, 2007, Turner filed a petition for allowance of appeal.

Doc. No. 20-7, pp. 1-25.  The Pennsylvania Supreme Court denied the petition on June 6, 2007.

Doc. No. 20-7, p. 39.

      The instant petition for a writ of habeas corpus was filed on August 10, 2007.  Doc. No.

1.  In accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties

have consented to have this matter resolved by a United States Magistrate Judge.  Doc. Nos. 25,

28 & 29.

**II.**     <u>**Standards of Review**</u>

     **A.**     **Exhaustion and Procedural Default**

      The exhaustion requirements applicable to claims asserted in a federal habeas corpus

petition are rooted in subsections (b) and (c) of 28 U.S.C. § 2254, which provide:

    **§ 2254.  State custody; remedies in Federal courts**

\*\*\*
(b)(1) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted unless it appears
that--
(A) the applicant has exhausted the remedies available in the courts of the State;
or
(B)(i) there is an absence of available State corrective process; or
(ii) circumstances exist that render such process ineffective to protect the rights of
the applicant.
(2) An application for a writ of habeas corpus may be denied on the merits,
notwithstanding the failure of the applicant to exhaust the remedies available in
the courts of the State.

> (3) A State shall not be deemed to have waived the exhaustion requirement or be
> estopped from reliance upon the requirement unless the State, through counsel,
> expressly waives the requirement.
> (c) An applicant shall not be deemed to have exhausted the remedies available in
> the courts of the State, within the meaning of this section, if he has the right under
> the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).  Consistent with this statutory mandate, each claim that a petitioner in state custody attempts to present to a federal court in a habeas corpus proceeding must have been "fairly presented" to each level of the applicable State's judiciary.  *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000).  "To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  Federal courts typically dismiss without prejudice claims that have not been properly presented to the state courts, thereby providing petitioners with an opportunity to exhaust such claims.  *Lines*, 208 F.3d at 159-160.

Where a claim asserted in a habeas corpus proceeding has not been presented to the state courts, the statutory exhaustion requirement can be satisfied on the alternative ground that there is "an absence of *available* State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i)(emphasis added).  This alternative ground requires a showing that state procedural rules preclude the petitioner from exhausting his or her claims in the state courts.  *Lines*, 208 F.3d at 160.  In order for the exhaustion requirement to be satisfied on this ground, however, the applicable procedural rules must "clearly foreclose" review of the petitioner's unexhausted claims by the state courts. *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002).  It is not sufficient for the petitioner to show that it is "unlikely" that further state remedies are available.  *Id.*

12

The mere fact that a petitioner can satisfy the statutory exhaustion requirement on the ground that further state procedures are unavailable does not necessarily mean that a federal court can reach the merits of his or her claims. *Lines*, 208 F.3d at 160. Claims deemed to have been exhausted because of a state procedural bar are procedurally defaulted, precluding a federal court from proceeding to address them further. *Id.* In *Cone v. Bell*, 129 S.Ct. 1769 (2009), the United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that "is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002). In the context of federal habeas proceedings, the independent and adequate state ground doctrine is designed to "ensur[e] that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Coleman*, 501 U.S. at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. When a petitioner fails to properly raise his federal claims in state court, he deprives the State of "an opportunity to address those claims in the first instance" and frustrates the State's ability to honor his constitutional rights. *Id.*, at 732, 748, 111 S.Ct. 2546, 115 L.Ed.2d 640. Therefore, consistent with the longstanding requirement that habeas petitioners must exhaust available state remedies before seeking relief in federal court, we have held that when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review. See *id.*, at 731, 111 S.Ct. 2546, 115 L.Ed.2d 640.

*Cone*, 129 S.Ct. at 1780 (brackets in original). This does not mean, however, that federal habeas corpus review is barred every time that a state court invokes a procedural rule to preclude its review of the federal claims asserted by a state prisoner. *Id.* The adequacy of a given state procedural rule to bar a federal court from reaching the merits of a petitioner's claim is a federal question. *Id.*; *Wright v. Georgia*, 373 U.S. 284, 288-293 (1963). A state procedural rule can preclude federal habeas corpus review only if it is "firmly established" and "consistently and

regularly applied" by the State's courts. *Kindler v. Horn*, 542 F.3d 70, 78 (3d Cir. 2009).  "In addition, the state rule must speak in unmistakable terms, and the state courts' refusal to review a petitioner's claim must be consistent with decisions in similar cases." *Id.* at 79.  "[A]n occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate." *Amos v. Scott*, 61 F.3d 333, 342 (5th Cir. 1995).  A state rule is adequate to preclude federal habeas corpus review if it is applied by the state courts in "the vast majority of cases." *Dugger v. Adams*, 489 U.S. 401, 410, n. 6 (1989).

In certain instances, a federal court may entertain claims that would ordinarily be subject to procedural default.  Because a writ of habeas corpus is an equitable remedy, the Supreme Court has found it inappropriate to rigidly apply the doctrine of *res judicata* in this context. *Schlup v. Delo*, 513 U.S. 298, 319 (1995).  A procedural default can be excused upon a showing of "cause" for the default and resulting "prejudice" to the petitioner. *Johnson v. Pinchak*, 392 F.3d 551, 563 (3d Cir. 2004)("A procedural default generally bars review of a federal habeas corpus petition *absent a showing of cause and prejudice*.")(emphasis added).  Cause for not exhausting a claim exists where an external impediment, "whether it be government interference or the reasonable unavailability of the factual basis for the claim," prevents the petitioner from exhausting the claim during the pendency of state judicial proceedings. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  If a petitioner can establish "cause" for procedurally defaulting a claim, he or she must shoulder the additional burden of showing "not merely that the errors at his [or her] trial created a *possibility* of prejudice, but that they worked to his [or her] *actual* and substantial disadvantage, infecting his [or her] trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)(emphasis in original).  If a procedural default

14

results from the ineffective assistance of counsel, the Sixth and Fourteenth Amendments require that the responsibility for the default be imputed to the State, which may not "[conduct] trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Murray v. Carrier*, 477 U.S. 478, 488 (1986)(brackets in original), quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).  Nonetheless, an error by the petitioner's attorney can be fairly characterized as the "cause" of a procedural default only where it is sufficiently egregious to constitute a constitutional violation under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993).

Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a fundamental miscarriage of justice. *Johnson*, 392 F.3d at 564.  This exception to the procedural default doctrine is based on the principle that, in certain instances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495, quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982).  The "prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has resulted in the conviction of an innocent defendant.  *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992).  In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts.  *Johnson*, 392 F.3d at 564.

In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for

which he or she is incarcerated.  *Schlup*, 513 U.S. at 324.  "To be credible, such a claim requires [the] petitioner to support his [or her] allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial."  *Id.*  If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence."  *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004).  This standard "does not merely require a showing that a reasonable doubt [as to the petitioner's guilt] exists in the light of the new evidence, but rather that no reasonable juror would have found the [petitioner] guilty."  *Schlup*, 513 U.S. at 329.  "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."  *House v. Bell*, 547 U.S. 518, 538 (2006).  While the petitioner's innocence need not be determined with "absolute certainty" at this "gateway stage," his or her burden is to demonstrate that, in light of the new evidence, it is more likely than not that *any* reasonable juror would have reasonable doubt as to the petitioner's guilt.  *Id.*

In the habeas corpus context, a federal court sits to ensure that an individual is not imprisoned in violation of the Constitution and laws of the United States, "not to correct errors of fact."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Consequently, a finding of "actual innocence" is not an independent ground for habeas corpus relief, but rather a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default.  *Id.* at 404.  In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal

court with no basis for adjudicating a procedurally defaulted claim. *Goldblum v. Klem*, 510 F.3d 204, 225-226 (3d Cir. 2007). Only after the presentation of *new* evidence may a federal court proceed to consider whether, in light of *all* relevant evidence, it is more likely than not that no reasonable juror would vote to convict the petitioner of the crime for which he or she is incarcerated. *House*, 547 U.S. at 537-539; *Goldblum*, 510 F.3d at 225-226.

### B.       Habeas Corpus Relief

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law on April 24, 1996. Pub. L. No. 104-132; 110 Stat. 1214 (1996). Title I of the AEDPA revised the statutory provisions governing a federal court's authority to issue writs of habeas corpus. Pub. L. No. 104-132, §§ 101-108; 110 Stat. at 1217-1226. Because Turner's petition was filed after the effective date of the AEDPA, the Court must apply the standards applicable under that statute. *Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000).

The relevant statutory language, which was enacted as a part of § 104 of the AEDPA and is currently codified at 28 U.S.C. § 2254(d), provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the statutory language makes clear, only the United States Supreme Court can "clearly establish" federal law for purposes of the AEDPA. *Mendez v. Knowles*, 556

F.3d 757, 767 (9th Cir. 2009); *Jennings v. Crosby*, 392 F.Supp.2d 1312, 1317, n. 4 (N.D.Fla. 2005); *Williams v. Spitzer*, 246 F.Supp.2d 368, 382 (S.D.N.Y. 2003).  A state court renders a decision that is "contrary to" clearly established federal law where it applies a rule that contradicts the governing law as articulated in a Supreme Court decision, or where it confronts a set of facts that is "materially indistinguishable" from that confronted by the Supreme Court but nevertheless reaches a result different than that reached by the Supreme Court in the applicable precedent.  *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000).  A state-court decision constitutes an "unreasonable application" of clearly established federal law where it "unreasonably applies the correct Supreme Court precedent to the facts of a case," or where it "unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply."  *Shelton v. Carroll*, 464 F.3d 423, 436 (3d Cir. 2006).

A federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that a state court has *incorrectly* applied clearly established federal law.  *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007).  Instead, the relevant question is whether the state court has applied a Supreme Court precedent to the facts of the petitioner's case in an "objectively unreasonable manner."  *Price v. Vincent*, 538 U.S. 634, 641 (2003).  A factual determination made by a state court is presumed to be correct in a subsequent habeas corpus proceeding, and the petitioner bears the burden of rebutting this presumption of correctness by producing "clear and convincing evidence" that a contrary determination is warranted.  28 U.S.C. § 2254(e)(1).

### C.     Ineffectiveness of Counsel

The Sixth Amendment to the United States Constitution provides that, "In all criminal

prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his

defence." U.S. CONST., AMEND. VI.  The Counsel Clause of the Sixth Amendment is applicable

to the States by virtue of the Due Process Clause of the Fourteenth Amendment.  *Gideon v.*

*Wainwright*, 372 U.S. 335, 342-345 (1963).  "It has long been recognized that the right to

counsel is the right to the *effective* assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759,

771, n. 14 (1970)(emphasis added).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the

proper standard for determining whether the representation provided by a defendant's trial

counsel has been ineffective.  Speaking through Justice O'Connor, the Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or death sentence has two components.  First, the
> defendant must show that counsel's performance was deficient.  This requires
> showing that counsel made errors so serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable.  Unless a defendant makes both
> showings, it cannot be said that the conviction or death sentence resulted from a
> breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  The first component of an ineffectiveness claim requires an inquiry

into whether the performance of the defendant's counsel has fallen "below an objective standard

of reasonableness."  *Id.* at 688.  "The proper measure of attorney performance remains simply

reasonableness under prevailing professional norms."  *Id.*  The second component requires an

inquiry into the impact that an identified deficiency has had on the defendant's trial.  In order to

set aside a conviction, a defendant must show that "there is a *reasonable probability* that, but for

[his or her] counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694 (emphasis added). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether a defendant has been prejudiced by constitutionally deficient representation, a court must consider "the totality of the evidence" heard by the trier of fact. *Id.* at 695. In situations where it is clear that a defendant cannot show that he or she has been prejudiced, a court is free to dispose of the case on that ground without deciding whether the representation provided to the defendant was deficient. *Id.* at 697.

The Supreme Court has construed the Due Process and Equal Protection Clauses of the Fourteenth Amendment to include the right of a convicted individual to have the assistance of counsel for a first-level appeal provided by the State as a matter of right. *Halbert v. Michigan*, 545 U.S. 605, 609-610 (2005). Because this right to appellate counsel is grounded in the Fourteenth Amendment rather than in the Sixth Amendment, its dimensions are somewhat different than those of the right to trial counsel guaranteed under the Counsel Clause. *Martinez v. Court of Appeal of California*, 528 U.S. 152, 154-164 (2000). Nevertheless, in *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that a first-level appeal provided as a matter of right is not adjudicated in accordance with the Constitution "if the appellant does not have the *effective* assistance of an attorney." *Evitts*, 469 U.S. at 396 (emphasis added). Therefore, an appellant has a constitutional right to the effective assistance of counsel when pursuing a non-discretionary appeal that is similar to the right to the effective assistance of counsel afforded by the Counsel Clause to a defendant subjected to a criminal trial. An individual alleging that the representation provided by his or her appellate counsel has been ineffective must satisfy the *Strickland* standard in order to obtain relief. *United States v. Mannino*, 212 F.3d 835, 840, n. 4

(3d Cir. 2000).

### III.   <u>Discussion</u>

Turner asserts five different claims in support of his petition for a writ of habeas corpus. His first two claims are ineffectiveness claims centering on his trial counsel's failure to request a "corrupted source" instruction concerning Carrington's testimony and failure to pursue the previously-filed motion seeking to compel Carrington to undergo a psychological examination. Doc. No. 1, pp. 5, 7. His remaining three claims are based on Bunkley's testimony. First, he argues that his Sixth Amendment rights were violated by the admission at trial of the incriminating statements that he had made to Bunkley. Doc. No. 1, p. 8. Second, he contends that his trial counsel was ineffective for failing to object to Bunkley's testimony. Doc. No. 1, p. 10. Third, he contends that his trial counsel was ineffective for eliciting damaging testimony from Bunkley on cross-examination. Doc. No. 1, p. 11. Because the claims concerning Bunkley's testimony can be disposed of on procedural grounds, the Court will address them before considering the merits of the remaining two claims.

#### A.     **The Procedural Default of the Claims Concerning Bunkley's Testimony**

The three claims concerning Bunkley's testimony were included in the *pro se* PCRA petition filed by Turner on September 14, 1998. Doc. No. 21, p. 3. Nevertheless, they were not included in the amended PCRA petition filed on November 6, 2003, nor were they referenced in the subsequent filings with the trial court, the Superior Court and the Pennsylvania Supreme Court. Doc. No. 20-5, pp. 2-20; Doc. No. 20-6, pp. 1-29; Doc. No. 20-7, pp. 1-25. In *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), the United States Supreme Court declared that, in order to properly exhaust his or her claims for habeas corpus purposes, a state prisoner "must give the

state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's appellate review process."  The inclusion of subsequently-abandoned claims within a *pro se* petition for collateral relief clearly fails to satisfy this standard.  Consequently, with respect to the claims concerning Bunkley's testimony at trial, Turner has not "exhausted the remedies available in the courts of the State" for purposes of § 2254(b)(1)(A).

Since Turner did not present these claims to the Pennsylvania courts, he must satisfy the statutory exhaustion requirement on the alternative ground that "there is an absence of available State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i).  This alternative prerequisite to the litigation of Turner's claims can be satisfied only if Pennsylvania law "clearly forecloses" review of such claims by the Pennsylvania courts.  *Lines*, 208 F.3d at 162-165.  An examination of the applicable principles of Pennsylvania law reveals that such review is clearly foreclosed under the provisions of the PCRA.

The relevant statutory language provides:

**§ 9545.  Jurisdiction and proceedings**

\*\*\*

**(b) Time for filing petition.--**
(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
    (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
    (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
    (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.
(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.
(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 PA. CONS. STAT. § 9545(b).  As the statutory language makes clear, the PCRA's one-year statute of limitations would apply to a "second or subsequent" petition filed by Turner.  On direct review, the Pennsylvania Supreme Court denied Turner's petition for allowance of appeal on September 9, 1997.  Doc. No. 20-5, p. 1.  Hence, his conviction became final on December 9, 1997, when discretionary review by the United States Supreme Court was no longer possible. *Bowles v. Russell*, 551 U.S. 205, 212 (2007)(recognizing that a petition for certiorari must be filed within 90 days of the decision that the petitioner seeks to have reviewed).  The PCRA's one-year limitations period expired on December 9, 1998.  The Pennsylvania courts lack jurisdiction to entertain untimely PCRA petitions.  *Commonwealth v. Hall*, 771 A.2d 1232, 1234 (Pa. 2001).  Moreover, the PCRA is the *sole* basis provided under Pennsylvania law for an incarcerated individual to collaterally attack his or her conviction and sentence.  *Commonwealth v. Ahlborn*, 699 A.2d 718, 721 (Pa. 1997).  Thus, any attempt by Turner to present his unexhausted claims to the Pennsylvania courts would be futile.

Since Turner has established that "there is an absence of available State corrective process" for him to pursue, he has satisfied the statutory exhaustion requirement.  28 U.S.C. § 2254(b)(1)(B)(i).  This determination, however, does not end the inquiry.  "A finding of futility merely eliminates the procedural pretense of requiring a federal habeas petitioner to return to an

23

unavailable state forum for nonexistent relief." *Lines*, 208 F.3d at 166. "Out of respect for finality, comity, and the orderly administration of justice," a federal court ordinarily will not entertain the merits of a claim that has been procedurally defaulted under state law. *Dretke v. Haley*, 541 U.S. 386, 388 (2004). The Supreme Court has observed that, in this circumstance, "considerations of comity and concerns for the orderly administration of criminal justice require a federal court to forgo the exercise of its habeas corpus power." *Francis v. Henderson*, 425 U.S. 536, 539 (1976). Nonetheless, this general principle is a qualified one. "[W]hile an adequate and independent state procedural disposition strips [the Supreme Court] of certiorari jurisdiction to review a state court's judgment, it provides only a strong prudential reason, grounded in 'considerations of comity and concerns for the orderly administration of justice,' not to pass upon a defaulted constitutional claim presented for federal habeas review." *Dretke*, 541 U.S. at 392-393, quoting *Francis*, 425 U.S. at 539. Accordingly, the Court can entertain Turner's defaulted claims if he can establish "cause" for defaulting them and resulting "prejudice" to him, or if he can establish that this Court's failure to consider the claims would result in a fundamental miscarriage of justice. *Hubbard*, 378 F.3d at 338.

Since Turner presents no new evidence of his innocence, he clearly cannot show that a miscarriage of justice would result from this Court's failure to consider the merits of his defaulted claims. *Goldblum*, 510 F.3d at 225. With respect to the "cause" and "prejudice" inquiry, an attorney's deficient performance can be properly characterized as the "cause" of a procedural default only where such deficiency is sufficiently egregious to constitute a violation of the United States Constitution. *Cristin v. Brennan*, 218 F.3d 404, 420 (3d Cir. 2002). The constitutional right to the *effective* assistance of counsel is dependent on the constitutional right

24

to counsel itself. *Evitts*, 469 U.S. at 396, n. 7. Turner had no *constitutional* right to counsel when he was pursuing collateral relief. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). When Farrell opted not to include the three claims concerning Bunkley's testimony within the amended PCRA petition, he was acting as Turner's agent. Consequently, Farrell's decision to abandon those claims was directly attributable to Turner. *Coleman v. Thompson*, 501 U.S. 722, 752-754 (1991). For this reason, the merits of the claims concerning Bunkley's testimony will not be considered.

### B.      The Failure to Request a "Corrupted Source" Instruction

Turner argues that his trial counsel was ineffective for failing to request a "corrupted source" jury instruction concerning Carrington's testimony, and that his appellate counsel was ineffective for failing to preserve this issue by raising an ineffectiveness claim on direct appeal. Doc. No. 1, p. 5. The Commonwealth argues that this claim was not properly exhausted. Doc. No. 20, pp. 14-15. Specifically, the Commonwealth contends that this layered ineffectiveness claim was not presented to the Pennsylvania courts as a *federal* claim. *Id.*

In order to properly exhaust a federal claim before a state court, a petitioner must make it clear to that court that his or her claim is based, at least in part, on the alleged violation of a federal right. *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005). It is not sufficient for a petitioner to *generally* rely on federal law. Instead, he or she must specify the precise nature of the federal claim at issue. *Duncan v. Henry*, 513 U.S. 364, 365-366 (1995). A federal claim is not "fairly presented" to a state court if that court must look beyond "a petition or brief" in order to discover or understand the basis for the claim. *Baldwin v. Reese*, 541 U.S. 27, 30-33 (2004).

Having thoroughly reviewed the record of the PCRA proceedings, the Court is convinced

that Turner's layered ineffectiveness claim was properly presented to the Pennsylvania courts as

a federal constitutional claim.  Turner's amended PCRA petition, appellate brief and petition for

allowance of appeal *all* made explicit reference to the Sixth Amendment.  Doc. No. 20-5, p. 8;

Doc. No. 20-6, p. 17; Doc. No. 20-7, p. 12.  Thus, the Pennsylvania courts were clearly on notice

that Turner was raising a federal claim.  Furthermore, where an individual raises an

"ineffectiveness" claim without specifying whether it is based on the United States Constitution

or the Pennsylvania Constitution, the Pennsylvania courts typically assume that he or she is

relying on *both* sources of law.  *Commonwealth v. Gribble*, 863 A.2d 455, 460 (Pa. 2004).  The

purpose of the statutory exhaustion requirement is to give the state courts an *opportunity* to

address violations of a petitioner's federal rights.  *Baldwin*, 541 U.S. at 29.  Such an

"opportunity" clearly exists when the federal nature of a claim is readily apparent to a state

court.  Because Turner's layered ineffectiveness claim was both *presented* and *adjudicated* as a

federal claim, the Court will proceed to consider it in accordance with the standards applicable

under the AEDPA.

The crux of Turner's argument is that he was prejudiced by his trial counsel's failure to

request a "corrupted source" jury instruction concerning Carrington's testimony.  Under

Pennsylvania law, an individual is legally accountable for the conduct of another person where

he or she "is an accomplice of such other person in the commission of the offense."  18 PA.

CONS. STAT. § 306(b)(3).  Pennsylvania law defines the term "accomplice" as follows:

### § 306.  Liability for conduct of another; complicity

\*\*\*
**(c) Accomplice defined.–**A person is an accomplice of another person in the
commission of an offense if:
(1) with the intent of promoting or facilitating the commission of the offense, he:

> (i) solicits such other person to commit it; or
> (ii) aids or agrees or attempts to aid such other person in planning or
> committing it; or
> (2) his conduct is expressly declared by law to establish his complicity.

18 PA. CONS. STAT. § 306(c).  In his filings with the Pennsylvania courts, Turner argued that his

trial counsel had been ineffective for not requesting the following jury instruction:

> These are special rules that apply to accomplice testimony:
> First, you should view the testimony of an accomplice with disfavor because it
> comes from a corrupt and polluted source.
> Second, you should examine the testimony of an accomplice closely and accept it
> only with care and caution.
> Third, you should consider whether the testimony of an accomplice is supported
> by independent evidence.

Doc. No. 20-5, p. 10; Doc. No. 20-6, pp. 18-19; Doc. No. 20-7, p. 13.  Turner contends that there

was sufficient evidence to enable the jury to infer that Carrington had been an accomplice to

Franklin's murder.

In Pennsylvania, "[i]t is well established that in any case where an accomplice implicates

the defendant, the judge should tell the jury that the accomplice is a corrupt and polluted source

whose testimony should be viewed with great caution."  *Commonwealth v. Chmiel*, 639 A.2d 9,

13 (Pa. 1994).  This type of instruction is warranted only where there is sufficient evidence to

present a jury question concerning whether the witness at issue was, in fact, an accomplice to the

crime for which the defendant is being tried.  *Commonwealth v. Williams*, 732 A.2d 1167, 1181

(Pa. 1999).  "Such a jury question is present when the witness could be indicted for the crime for

which the accused is charged."  *Id.*  An accomplice instruction is *not* warranted where the

evidence indicates that the witness was merely present for the charged crime, or where it is

apparent that the witness has simply tried to help the defendant evade arrest or punishment *after*

the commission of the offense.  *Commonwealth v. Collins*, 957 A.2d 237, 263 (Pa. 2008).  Where

there is no evidence permitting the jury to infer that a witness was an accomplice, the court may

conclude as a matter of law that he or she was not an accomplice, and may refuse to give an

accomplice instruction.  *Commonwealth v. Manchas*, 633 A.2d 618, 627 (Pa.Super.Ct. 1993).

During the PCRA proceedings, Farrell presented the Pennsylvania courts with a certified

statement indicating that Thomassey did not know why he had failed to ask the trial judge for a

"corrupted source" instruction relating to Carrington's testimony.  Doc. No. 20-5, p. 21.  The

trial court and the Superior Court denied Turner's layered ineffectiveness claim on the ground

that Thomassey's failure to request a "corrupted source" instruction had been based on a

reasonable trial strategy.  Doc. No. 20-5, pp. 33-34; Doc. No. 20-6, p. 39.  According to both the

trial court and the Superior Court, a request for a "corrupted source" instruction would have

constituted a concession that Turner had been involved in Franklin's murder to some extent.  *Id.*

Such a concession, of course, would have been inconsistent with Turner's position that he had

not even been present at Franklin's residence at the time of the murder.  STT at 476.  It is

axiomatic that an attorney may reasonably decide not to request an accomplice instruction under

circumstances in which such a request could be construed as an admission of his or her client's

*complicity* in the crime at issue.  *Commonwealth v. Karabin*, 426 A.2d 91, 93 (Pa. 1981).

Admittedly, the Superior Court's abbreviated analysis of this issue did not address the

propriety of an accomplice instruction in the event that Carrington had been complicit in

*someone else's* commission of the murder.  Turner's defense was not based on an assertion that

Carrington had played no role in the crime.  Indeed, both witnesses testifying in Turner's defense

stated that Carrington had claimed responsibility for the killing.  STT at 432, 440-441.  It is not

28

entirely clear whether an accomplice instruction is properly given in Pennsylvania under circumstances in which a witness is alleged to have been an accomplice to a crime principally committed by someone other than the defendant.[5]  Had the Pennsylvania courts addressed this question and answered it in the negative, this Court would have been bound by such a determination.  *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004).  Unfortunately, the issue was never addressed by the Pennsylvania courts.

The record contains affirmative evidence indicating that Thomassey "did not know" why he had not requested an accomplice instruction.[6]  Doc. No. 20-5, p. 21.  No evidentiary hearing was held concerning this issue.  The lack of an evidentiary record to support the assertion that Thomassey had a "reasonable basis" for not requesting an accomplice instruction makes it difficult for the Court to determine whether the Superior Court's decision was a reasonable application of *Strickland*.  Nevertheless, the Supreme Court made it clear in *Strickland* that a court may decline to consider whether an attorney's performance has been constitutionally deficient under circumstances in which it can easily be determined that the defendant has not been prejudiced by the allegedly deficient performance.  *Strickland*, 466 U.S. at 697.  Because it is clear that Turner was not prejudiced by Thomassey's failure to request a "corrupted source"

---

[5]The trial judge actually gave accomplice instructions to the jury at Turner's trial.  STT at 503-505.  Because Turner's defense had been that someone else (i.e., either Carrington or a third person) had committed the crime, the Court assumes that the trial judge gave accomplice instructions so that the jury could consider whether Carrington had been "corrupted" by her alleged participation in the killing (i.e., either as the principal murderer or as an accomplice of a third person).  For this reason, the Court cannot presume that accomplice instructions are proper under Pennsylvania law only where a witness is alleged to have been an accomplice *of the defendant*.

[6]During a colloquy with the trial judge conducted outside of the jury's presence, Thomassey opined that Carrington had been an accomplice to the murder.  STT at 324-325.  The trial judge responded by stating that an individual cannot be an "accomplice under duress."  STT at 325.  Nevertheless, the trial judge told Thomassey that he could ask Carrington whether she had been offered lenient treatment from law enforcement authorities in exchange for her statement concerning Turner's involvement with the murder.  *Id.*  Thomassey pursued this line of questioning with Carrington on cross-examination.  STT at 387-388.  Thus, it appears that Thomassey's strategy was based, at least to some extent, on an attempt to portray Carrington as a "corrupted source."

instruction, the Court assumes *arguendo* that this omission was professionally deficient, and that the Superior Court's decision to the contrary was objectively unreasonable.[7]

The Superior Court did not reach the issue of prejudice.  Doc. No. 20-6, p. 39.  Therefore, this Court must consider that issue *de novo*.  *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).  At trial, the trial judge gave the following instructions to the jury:

> If you find that a witness was an accomplice of a perpetrator of a crime, that is, a person who aids or agrees or attempts to aid such other person in the planning or commission of a crime, then you are required by the law to treat that testimony differently than you would the testimony of an ordinary witness.  You must decide whether or not, first, the person was an accomplice to the crime.
>
> An accomplice may be defined as a person who knowingly, voluntarily cooperates or aids another in the commission of a crime.  If you so find that any witness was an accomplice of the person who committed the crime, then there are special rules which you must follow.
>
> First, you should view the testimony of an accomplice with disfavor because it comes from a corrupted, lewd source.  Secondly, you should examine the testimony of the accomplice closely and accept it only with care and caution.  Third, you should consider whether the testimony of the accomplice was supported in whole or in part by other evidence.
>
> Accomplice testimony is more dependable if supported by independent evidence; however, even if there is no independent supporting evidence, you may still find the Defendant guilty solely on the basis of the accomplice's testimony if you are satisfied that the testimony convinces you beyond a reasonable doubt of the Defendant's guilt.
>
> If, however, you find that any witness was not an accomplice of the perpetrator of the offense, then you should ignore these special rules and treat that testimony as you would the testimony of any other witness.

STT at 503-505.  Even though Thomassey had not *requested* accomplice instructions, such instructions *were given* in any event.

The Court acknowledges that, in some instances, Pennsylvania courts have formulated

---

[7]The Court does not mean to imply that the Superior Court's decision was, in fact, unreasonable.  The Court makes this assumption only because the lack of prejudice in this case renders review of the Superior Court's determination unnecessary.

*specific* accomplice instructions concerning the testimony given by *particular* witnesses. *Commonwealth v. Reid*, 642 A.2d 453, 461-462 (Pa. 1994); *Commonwealth v. Banks*, 285 A.2d 506, 508-509 (Pa. 1971).  Nevertheless, the Pennsylvania courts have also recognized that *general* accomplice instructions which do not identify particular witnesses are often sufficient to advise a jury of its responsibility to scrutinize testimony given by "corrupted sources."[8] *Commonwealth v. Williams*, 144 A.2d 634, 639 (Pa.Super.Ct. 1958).  In the instant case, Carrington was the *only* witness to whom the trial judge's accomplice instructions could have reasonably applied, since none of the other witnesses had been implicated in the murder.  It is difficult to fathom how the jury could have listened to the trial judge give accomplice instructions and *not* considered their direct application to Carrington's testimony.[9]

In order to obtain habeas corpus relief, Turner must show that there is a *reasonable probability* that, but for his trial counsel's alleged mistake, the result of the trial would have been different.  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  Turner cannot meet that standard.  The jury received proper instructions regarding the manner in which an accomplice's testimony should be considered.  STT at 503-505.  The law presumes that jurors follow the instructions that they have been given.  *United States v. Olano*, 507 U.S. 725, 740-741 (1993).  The Court's inquiry need not proceed further.  Because Turner cannot show that Thomassey's alleged error was

---

[8]The precise form of a particular accomplice instruction lies within the discretion of the trial court. *Commonwealth v. Olitsky*, 133 A.2d 238, 242 (Pa.Super.Ct. 1957).

[9]Turner is not specific as to whether he believes that the trial judge should have instructed the jury that Carrington had been an accomplice as a matter of law, or whether he believes that the trial judge should have allowed the jury to make that determination by making explicit reference to Carrington's testimony when giving the jury instructions.  Doc. No. 1, p. 5.  Having reviewed the trial transcript in considerable detail, the Court is convinced that the trial judge would have had no basis for concluding as a matter of law that Carrington had been an accomplice.  *Commonwealth v. Jones*, 668 A.2d 491, 516-518 (Pa. 1995).

prejudicial, his layered ineffectiveness claim does not entitle him to habeas corpus relief.[10]

*Strickland*, 466 U.S. at 691-698.

### C.    The Failure to Pursue the Motion for a Compelled Psychological Examination

Turner argues that his trial counsel was ineffective for failing to pursue an earlier-filed motion for an order compelling Carrington to undergo a psychological examination, and that his appellate counsel was ineffective for failing to raise the issue on direct appeal. Doc. No. 1, p. 5. On February 18, 1992, Turner's first trial ended in a mistrial, since the jury had been unable to reach a verdict. FTT at 624-626. Thomassey filed a motion on June 24, 1992, seeking an order requiring Carrington to undergo a psychological examination. Doc. No. 20-5, pp. 25-28. The purpose of the proposed examination was to enable the trial court to assess Carrington's competence to testify at the upcoming retrial. Doc. No. 20-5, p. 25, ¶ 6. The trial court never ruled on the motion. A hearing concerning the motion was apparently scheduled for August 10, 1992, but it was not conducted. Doc. No. 20-5, pp. 22, 24. Although the record is not entirely clear as to why the motion was never addressed, it appears that the motion may have been overlooked when Turner's case was transferred from Judge Dauer to Judge Manning.

Carrington's medical records are not before the Court. Nevertheless, a review of the trial transcript reveals that she was once hospitalized for approximately three weeks after attempting suicide. STT at 339. On a separate occasion, she spent two weeks in a psychiatric unit. STT at 341. There was apparently another occasion on which Carrington sought inpatient psychiatric

---

[10]Since Turner cannot establish that he was prejudiced by his trial counsel's failure to request a "corrupted source" instruction, it follows *a fortiori* that he cannot establish that he was prejudiced by his appellate counsel's failure to raise the issue on direct appeal. *Commonwealth v. D'Amato*, 856 A.2d 806, 812-813 (Pa. 2004).

treatment and left the facility before being evaluated.  *Id.*  Thomassey elicited this information

from Carrington on cross-examination.  STT at 339-345.  The Commonwealth objected to this

line of questioning, and the objection was sustained.  STT at 344.  During a previous sidebar

conference, the trial judge had informed Thomassey that he could ask Carrington about her

psychiatric ailments only insofar as they were relevant to her ability to observe and remember

events directly associated with the incident in question.  STT at 340-343.

In his amended PCRA petition, Turner argued that Thomassey had been ineffective for

failing to pursue the motion to compel Carrington to undergo a psychological examination.  Doc.

No. 20-5, pp. 15-18.  In a single sentence, Turner declared that Elash had been ineffective for

failing to raise an ineffectiveness claim regarding this issue on direct appeal.  Doc. No. 20-5, p.

15.  Attached to the amended PCRA petition were four exhibits, three of which were certified

statements from Farrell.[11]  Doc. No. 20-5, pp. 21-24.  Exhibit A, which was such a certified

statement, declared as follows:

> Undersigned counsel contacted Mr. Turner's trial counsel, Patrick Thomassey,
> Esquire regarding the issues raised in this PCRA Petition.  Mr. Thomassey
> informed undersigned counsel that he did not remember what happened to the
> Motion for Psychological Evaluation for Commonwealth Witness.  Mr.
> Thomassey stated that he did not know why he did not ask for a corrupted source
> instruction in this case.

Doc. No. 20-5, p. 21.  Exhibit C, which was also a certified statement from Farrell, declared as

follows:

---

[11]Two of the four exhibits concerned the hearing that had been scheduled for August 10, 1992.  Exhibit D
was a copy of the notice informing the parties that the hearing had been scheduled.  Doc. No. 20-5, p. 24.  Exhibit B
was a certified statement from Farrell indicating that Jane Hirsch, the court reporter assigned to Judge Dauer's
courtroom on August 10, 1992, had confirmed that no hearing relating to a psychological examination of Carrington
had been conducted on that day.  Doc. No. 20-5, p. 22.

> Undersigned counsel contacted Mr. Turner's appellate counsel John Elash,
> Esquire regarding the issues raised in this PCRA Petition. Mr. Elash informed
> undersigned counsel that he did not remember and/or have a reason for not
> investigating the Motion for Psychological Evaluation for Commonwealth
> Witness filed by trial counsel. Mr. Elash stated that he did not remember and/or
> have a reason for not raising trial counsel's ineffectiveness for failing to ask for a
> corrupted source instruction in this case.

Doc. No. 20-5, p. 23. In both his appellate brief and petition for allowance of appeal, Turner

focused primarily on Thomassey's alleged ineffectiveness for failing to pursue the motion for a

compelled psychological examination prior to the retrial but also included brief sentences

declaring that Elash had been ineffective for failing to raise the issue on direct appeal. Doc. No.

20-6, p. 25; Doc. No. 20-7, p. 20.

In his memorandum opinion of July 10, 2005, the trial judge held that Turner had waived

his claim of trial-counsel ineffectiveness by failing to allege that his appellate counsel had also

been ineffective. Doc. No. 20-5, p. 34. He went on to say that even if the issue had not been

waived, the underlying claim would have been lacking in merit because Turner had presented no

evidence of Carrington's incompetency to justify subjecting her to a psychological examination.

*Id.* The Superior Court likewise stated that the issue had been waived because of Turner's

failure to properly layer it, and that the underlying claim would not have been meritorious in any

event. Doc. No. 20-6, p. 40.

A federal claim is not "fairly presented" to a state court unless it is presented under

circumstances in which it could be entertained by that court in conformity with the applicable

state procedural rules. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). The Pennsylvania

courts held that Turner's ineffectiveness claim had been waived, thereby invoking a procedural

rule to preclude Turner from seeking collateral relief. Doc. No. 20-5, p. 34; Doc. No. 20-6, p.

34

40.  As noted earlier, however, the invocation of a procedural rule by a state court to bar a

federal claim does not automatically preclude a federal court from adjudicating that claim in a

habeas corpus proceeding.  *Cone*, 129 S.Ct. at 1780.  In this context, the *adequacy* of a state

procedural rule is a *federal* question.  *Id.*

In *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002), the Pennsylvania Supreme

Court held that ineffectiveness claims should generally be raised on collateral review rather than

on direct review.  Prior to *Grant*, a claim of ineffectiveness needed to be raised at the earliest

stage in the proceedings at which the attorney whose performance was being challenged was no

longer representing the defendant.  *Commonwealth v. Hubbard*, 372 A.2d 687, 695, n. 6 (Pa.

1977).  Because Turner's conviction had become final before *Grant* was decided, he was not

able to avail himself of the rule established in that case.  *Commonwealth v. Clark*, 961 A.2d 80,

85 (Pa. 2008).  Therefore, his claim was governed by the Pennsylvania Supreme Court's decision

in *Commonwealth v. McGill*, 832 A.2d 1014 (Pa. 2003).

In *McGill*, the Pennsylvania Supreme Court held that, when the pre-*Grant* rule is being

applied, the only claim of ineffectiveness that may be raised during a PCRA proceeding is a

claim concerning the ineffectiveness of the petitioner's appellate counsel.  *McGill*, 832 A.2d at

1021.  Under these circumstances, the petitioner must *plead* and *prove* the ineffectiveness of his

or her appellate counsel for failing to raise the ineffectiveness of his or her trial counsel in order

to obtain collateral relief based on the underlying professional error.  *Id.* at 1022.  This requires

the presentation of arguments concerning the alleged ineffectiveness of the petitioner's *appellate*

counsel under *Strickland* and *Evitts*.[12]  *Id.*  Both the trial court and the Superior Court determined

that Turner had waived his ineffectiveness claim by failing to properly layer it in accordance

with *McGill*.  Doc. No. 20-5, p. 34; Doc. No. 20-6, p. 40.  The question presently before the

Court is whether the rule established in *McGill*, as applied in Turner's case, is an adequate state

procedural ground to preclude review of the underlying ineffectiveness claim in this habeas

corpus proceeding.  A close examination of Pennsylvania law reveals that this question must be

answered in the negative.

> Pennsylvania Rule of Criminal Procedure 905(B) provides:
>
> When a petition for post-conviction collateral relief is defective as originally
> filed, the judge shall order amendment of the petition, indicate the nature of the
> defects, and specify the time within which an amended petition shall be filed.  If
> the order directing amendment is not complied with, the petition may be
> dismissed without a hearing.

PA. R. CRIM. P. 905(B).  In *McGill*, the Pennsylvania Supreme Court recognized that a trial court

could utilize Rule 905(B) in order to avoid dismissing an ineffectiveness claim that was not

properly layered.  *McGill*, 832 A.2d at 1024.  Indeed, it was noted in *McGill* that unlayered

ineffectiveness claims pending before Pennsylvania appellate courts would need to be remanded

to the appropriate trial courts so that defective PCRA petitions could be amended to conform to

---

[12]The Pennsylvania Supreme Court examines ineffectiveness claims arising under the Pennsylvania Constitution in accordance with a framework that is not materially different than that applicable to ineffectiveness claims arising under the United States Constitution.  *Commonwealth v. Gribble*, 863 A.2d 455, 460 (Pa. 2004)(treating a vague "ineffectiveness" claim as a claim arising under both the United States and Pennsylvania Constitutions, and dealing with both issues simultaneously).  The Pennsylvania courts sometimes refer to *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987), which is the governing precedent of the Pennsylvania Supreme Court, rather than to *Strickland v. Washington*, 466 U.S. 668 (1984), and *Evitts v. Lucey*, 469 U.S. 387 (1985), when discussing the applicable constitutional standard.  *Commonwealth v. McGill*, 832 A.2d 1014, 1022 (Pa. 2003).  In the habeas corpus context, however, the question is whether the Pennsylvania courts have unreasonably applied *Strickland* and *Evitts*, which are the governing precedents of the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Consequently, this Court's analysis refers directly to *Strickland* and *Evitts* even though the Pennsylvania courts typically refer to *Pierce*.

the newly-articulated rule.  *Id.*

The Pennsylvania Supreme Court has made it clear that trial courts resolving PCRA petitions should request amended pleadings in conformity with Rule 905(B) before dismissing petitions because of their failure to comply with *McGill*.  *Commonwealth v. Dennis*, 950 A.2d 945, 956 (Pa. 2008); *Commonwealth v. Carson*, 913 A.2d 220, 233-234 (Pa. 2006).  Although the trial judge gave Turner twenty days to "respond" to his memorandum opinion of July 10, 2005, he did not specifically request an amended petition.  Doc. No. 20-5, p. 35.  Moreover, Turner specifically referenced the alleged ineffectiveness of his *appellate* counsel in his PCRA petition.  Doc. No. 20-5, p. 15.  The Court acknowledges that an independent assessment of the reasonableness of an appellate attorney's decision not to raise an argument is necessary to satisfy *McGill*, and that a boilerplate reference to that attorney's ineffectiveness in failing to raise the ineffectiveness of the petitioner's trial counsel may often be insufficient to surmount this hurdle. *Commonwealth v. Edmiston*, 851 A.2d 883, 891 (Pa. 2004).  In this case, however, Turner's petition was supplemented by Farrell's statement indicating that Elash could not articulate a reason for not raising Thomassey's trial-level ineffectiveness on direct appeal.  Doc. No. 20-5, p. 23.  Neither the trial court nor the Superior Court acknowledged Farrell's statement.  Doc. No. 20-5, p. 34; Doc. No. 20-6, p. 40.  Both courts summarily dismissed Turner's ineffectiveness claim on the ground of waiver.  *Id.*  Neither court acknowledged the references to Elash's ineffectiveness that had been presented by Turner.  *Id.*

The rule articulated in *McGill*, which calls for an opportunity for an amended petition to be filed rather than a summary dismissal, is not adequate to preclude federal review of Turner's ineffectiveness claim in the instant habeas corpus proceeding.  This is particularly true in light of

37

the fact that Turner's petition and filings were supplemented by Farrell's statement attacking

Elash's decision not to raise the issue of the psychological examination on direct appeal.  As

discussed earlier, a state procedural rule can preclude federal habeas corpus review only if it is

both "firmly established" and "consistently and regularly applied" by the State's courts.  *Kindler*,

542 F.3d at 78.  That standard is not met here.  Consequently, the Court must address the merits

of Turner's layered ineffectiveness claim.

Because Elash (rather than Thomassey) represented Turner on direct appeal, claims based

on Thomassey's alleged ineffectiveness at trial were subject to waiver on direct review.

*Commonwealth v. Hubbard*, 372 A.2d 687, 695, n. 6 (Pa. 1977).  If Elash was ineffective,

however, such ineffectiveness would constitute "cause" for Turner's procedural default, thereby

enabling this Court to address the underlying claim of trial-counsel ineffectiveness in the instant

habeas corpus proceeding.  *Coleman v. Thompson*, 501 U.S. 722, 753-754 (1991).  The PCRA's

waiver provision precluded Turner from raising a direct claim of trial-counsel ineffectiveness on

collateral review.  42 PA. CONS. STAT. § 9544(b).  Since the Court deems Turner's claim of

appellate-counsel ineffectiveness to have been "fairly presented" to the Pennsylvania courts, that

claim is before the Court at the present time.[13]  Thus, the Court's determination as to whether

Elash was ineffective will serve to determine *both* whether Turner is entitled to habeas corpus

relief on the ground of appellate-counsel ineffectiveness *and* whether Turner can establish

"cause" for defaulting his trial-counsel ineffectiveness claim.

Before determining whether Turner's appellate counsel was ineffective, the Court must

---

[13]The Court construes Turner's *pro se* petition for a writ of habeas corpus to assert that *both* his trial counsel *and* his appellate counsel were ineffective for failing to pursue the issue concerning the propriety of a psychological examination to ascertain Carrington's competence to testify.  Doc. No. 1, p. 7.

decide what standard of review should govern the resolution of that issue.  In disposing of

Turner's layered ineffectiveness claim during the PCRA proceedings, the Superior Court

declared:

> Appellant's second claim of ineffectiveness of trial counsel is waived because he
> did not raise it as a layered claim, also alleging appellate counsel's ineffectiveness
> for failing to raise trial counsel's ineffectiveness on appeal.  ***McGill***, ***supra*** at 587,
> 832 A.2d at 1022.  Even if appellant had not waived the issue, we would find no
> merit to it as appellant failed to provide any documentation or proof that Ms.
> Carrington was not competent to testify such that a psychological evaluation of
> Ms. Carrington would have changed the outcome of the case.  Additionally, trial
> counsel's strategy was vigorously to attempt to discredit Ms. Carrington based on
> inconsistencies in the stories she had given at different times.  (Notes of
> testimony, 5/7/93 at 368-369.)

Doc. No. 20-6, p. 40 (italics and boldface type in original).  Although the Superior Court

determined that Turner's claim was procedurally barred, it went on to opine that the claim was

lacking in merit in any event.  If the Superior Court's observation concerning the merits of

Turner's claim constituted a merits-based adjudication, this Court must accord that

"adjudication" deference under the AEDPA.  28 U.S.C. § 2254(d).  On the other hand, if that

observation did not constitute a merits-based adjudication, the issue is subject to *de novo* review.

*Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

The issue of what standard of review should govern in this circumstance has divided

federal courts.  Some courts of appeals have held that an indication from a state court that the

merits of a particular claim have been considered and rejected even in the presence of a

procedural bar constitutes an alternative "adjudication" that is entitled to deference under the

AEDPA.  *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009); *Brooks v. Bagley*, 513 F.3d

618, 624-625 (6th Cir. 2008); *Busby v. Dretke*, 359 F.3d 708, 721, n. 14 (5th Cir. 2004).  A district

court within this circuit has taken the opposite view, holding that a claim is not "adjudicated on the merits" when it is disposed of on a procedural ground, regardless of whether a state court has rendered an opinion concerning the merits of that claim. *Holloway v. Horn*, 161 F.Supp.2d 452, 480-481 (E.D.Pa. 2001). The United States Court of Appeals for the Second Circuit has taken a middle-of-the-road position, holding that the propriety of AEDPA deference turns on whether the merits-based language in the relevant state-court decision constitutes an "alternative holding" or a "contingent observation." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007). Under this third approach, the Superior Court's statement in its opinion affirming the denial of Turner's PCRA petition would *not* be entitled to AEDPA deference, since the "observation" was phrased in "contingent" terms. *Id.*; Doc. No. 20-6, p. 40 ("Even *if* appellant had not waived the issue, we *would* find no merit . . . .")(emphasis added). Of course, the propriety of AEDPA deference need not be determined where it is clear that a petitioner is not entitled to habeas corpus relief even if his or her claim is subject to *de novo* consideration. *Johnson v. McKune*, 288 F.3d 1187, 1192 (10th Cir. 2002).

Because it is apparent that Turner's claim of appellate-counsel ineffectiveness is without merit, the Court assumes *arguendo* that *de novo* review of the issue is appropriate. As an initial matter, the Constitution did not require Elash to raise every conceivable nonfrivolous argument before the Superior Court. *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1422 (2009). Furthermore, even if it is assumed that Elash's failure to investigate the reasons for Thomassey's abandonment of the previously-filed motion to compel a psychological examination of Carrington was professionally unreasonable, an examination of Pennsylvania law reveals that Turner cannot establish that he was prejudiced by this omission.

When a witness called by the Commonwealth to testify against a defendant suffers from a condition *relevant to his or her ability to accurately observe and report events*, the jury must be informed of this disability in order to properly assess the credibility of the witness' testimony. *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1082 (Pa. 2001).  Nevertheless, a witness cannot be compelled to undergo an invasive medical examination in the absence of a showing by the defendant that such an examination will yield evidence with probative value concerning the specific factual question at issue.  *Commonwealth v. Davis*, 650 A.2d 452, 457-458 (Pa.Super.Ct. 1994).  Although Turner possessed generalized evidence of Carrington's history of psychiatric treatment, he failed to present the trial court with evidence that Carrington's psychiatric problems had somehow lessened *her ability to accurately observe and report the events surrounding the crime at issue*.  STT at 340-344.  During the PCRA proceedings, the trial court opined that a psychological examination of Carrington would not have been ordered because of the absence of evidence indicating that her psychiatric problems had rendered her incompetent to testify.  Doc. No. 20-5, p. 34.  Because there was no evidence of Carrington's incompetence, Turner was not entitled to have her examined, nor was he entitled to cross-examine her about her psychiatric condition.  *Commonwealth v. Alston*, 864 A.2d 539, 549 (Pa.Super.Ct. 2004).  The Court notes that, during Turner's trial, the trial judge sustained the Commonwealth's objections to Thomassey's questions concerning Carrington's psychiatric hospitalizations.  STT at 344.

Because there is no reasonable probability that Turner's direct appeal would have been successful had Elash argued that Thomassey had been ineffective for failing to pursue the motion to compel a psychological examination of Carrington, Turner cannot establish that he was prejudiced by Elash's omission.  *Smith v. Robbins*, 528 U.S. 259, 285-286 (2000).  The Court

need not consider whether this omission was professionally unreasonable, since Turner cannot

establish the existence of prejudice in any event.  *Id.* at 286, n. 14.  Since Turner cannot show

that Elash's appellate representation was ineffective, he cannot establish "cause" for the

procedural default of his claim of trial-counsel ineffectiveness on direct review.  *Hodge v. United

States*, 554 F.3d 372, 379-380 (3d Cir. 2009).  Accordingly, Turner is not entitled to habeas

corpus relief.

> **D.**     **Certificate of Appealability**

In the absence of a COA, Turner may not appeal this Court's decision denying his

petition for a writ of habeas corpus.  28 U.S.C. § 2253(c)(1)(A).  A COA may be issued only if

Turner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253(c)(2).  With respect to this Court's merits-based determinations, he can obtain a COA only

by demonstrating that reasonable jurists would find this Court's assessment and disposition of

his claims to be "debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  With

respect to the claims which have been rejected on procedural grounds, Turner must show *both*

"that jurists of reason would find it debatable whether [his] petition states a valid claim of the

denial of a constitutional right" *and* "that jurists of reason would find it debatable whether [this

Court is] correct in its procedural ruling[s]."  *Id.*  Since reasonable jurists would not quarrel with

this Court's assessment and disposition of the substantive and procedural issues in this case,

Turner is not entitled to a COA with respect to any of the issues raised in his petition or

discussed in this opinion.

## IV.    <u>Conclusion</u>

The claims concerning Bunkley's testimony were procedurally defaulted during the

pendency of state judicial proceedings, and the remaining two claims are without merit.  Turner

is not entitled to habeas corpus relief.  Given that reasonable jurists would not view the issues in

this case differently, Turner is not entitled to a COA.

**AND NOW**, this 9th of October, 2009, **IT IS HEREBY ORDERED** that the Petition for

a Writ of Habeas Corpus is **DENIED**, that the implied request for a certificate of appealability is

**DENIED**, and that the Clerk of Court shall mark this case as closed.  **IT IS FURTHER**

**ORDERED** that, pursuant to Federal Rule of Appellate Procedure 4(a)(1), the Petitioner has

thirty (30) days to file a notice of appeal in accordance with Federal Rule of Appellate Procedure

3.

> By the Court:
>
> Lisa Pupo Lenihan
> United States Magistrate Judge

cc:     All Counsel of Record

        Antonio J. Turner
        State Correctional Institution-Waymart
        P.O. Box 256
        Waymart, PA 18472

43